**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Jill D. Gustafson and Daniel E. Gustafson, | Case No. 25-cv-4764 |
| Plaintiffs, | |
| | **COMPLAINT** |
| v. | **Jury Trial Demanded** |
| City of Nowthen, Minnesota, | |
| Defendant. | |

---

The Plaintiffs Jill D. Gustafson and Daniel E. Gustafson (the "Plaintiffs") for their complaint against the Defendant, City of Nowthen, Minnesota (the "Defendant"), allege as follows:

## INTRODUCTION

1. The Plaintiffs bring this action against the Defendant seeking injunctive, and monetary relief for the Defendant's violation of the Plaintiffs' rights under federal and state constitutional, statutory, and common law. The Plaintiffs' claims arise from their more than two-year long attempt to divide two parcels of land into three, so that their son Jason and his family could build a home on the property (the "Property"). That Property is located contiguous but just south of the Plaintiffs' current residence.

2. The Defendant arbitrarily and wrongfully refused to allow a simple lot split on the Property. The Defendant incorrectly treated the Plaintiffs as a land developer thereby imposing numerous extraneous actions at significant expense – including wetland delineation, plat development, deeding land for a public roadway, building a public two-

lane asphalt road, and deeding over various areas for future stormwater ponds.  At all times, the Defendant knew that the Plaintiffs did not plan to develop the Property but rather wanted to provide their son and his family with a smaller lot to build their house.

3.     The Defendant also required execution of a "Developers' Agreement" that contained many unnecessary and costly requirements, even though it always knew that the Plaintiffs had no intention of developing the Property commercially.  Even if the Plaintiffs were developers (which they are not), the various requirements and restrictions (which include an average minimum lot size of five acres), preclude economically viable, commercial development of the Property as contemplated by the City ordinances.  Despite this, the Defendant failed to individualize the analysis of the Plaintiffs' requests as required by the applicable law.

4.     After almost two years of negotiations, and long after the Plaintiffs understood that they had an agreement with the Defendant to resolve their disputes, the Plaintiffs still did not have the approvals they needed from the Defendant. When the Plaintiffs suggested that they might need to pursue litigation to clarify their rights under the applicable law, the Defendant abruptly cancelled the Plaintiffs' preliminary and final plat approval. Defendant made clear that this cancellation requires the Plaintiffs to start the costly and time-consuming approval process all over again.

5.     The Defendant's actions constitute an unlawful taking of the Property without just compensation and in retaliation in violation of the federal and state constitutions.  By seeking to impose excessive requirements on the Plaintiffs' permit application, the Defendant caused significant delay, expense and damage to the Plaintiffs

without sufficient justification. The Plaintiffs now seek injunctive, and monetary relief for the Defendant's violations of the Plaintiffs' rights under state and federal law.

## JURISDICTION

6. Subject matter jurisdiction exists in this Court pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 1983 and 1988.

7. Supplemental jurisdiction exists over the pendent state law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this Court under 28 U.S.C. § 1391 and other applicable law, because both the Property and the alleged deprivations of constitutional rights occurred in a county located within the District of Minnesota, and future deprivations of their constitutional rights are threatened and are likely to occur in this District. Venue is also proper as Defendant is an entity with the capacity to sue and be sued within this District.

## PARTIES

9. The Plaintiffs, Jill D. Gustafson and Daniel E. Gustafson, reside at 20840 Engen Blvd. NW, Nowthen, MN 55330. They purchased the Property (just south of their residence) in 2015.

10. The Defendant, City of Nowthen, is a municipal and political subdivision of the State of Minnesota and can sue and be sued in its own name.

## FACTUAL BACKGROUND

11. In approximately 2022, the Plaintiffs first approached the Defendant (through the then City Planner Consultant Elizabeth Stockman ("Stockman")) to discuss

their request to split the Property to allow their son Jason and his family to build a house on a portion of the approximately 38 acres. This proposal would allow the Property to be split from two parcels to three parcels.

12.    At that time, Stockman recommended that the Plaintiffs administratively combine the existing two parcels into one parcel for ease and expediency of dividing the Property into three lots. On Stockman's advice, the Plaintiffs administratively combined the two lots which they know understand cannot be undone.

13.    In addition to providing a lot for their son to build a home for his family, the Plaintiffs also wanted to divide the Property so that they would have the option in the future to build a retirement home. The plan was for the Plaintiffs' daughter and her family to buy Plaintiffs' original home if the Plaintiffs constructed a new retirement residence.

14.    The Plaintiffs' only purpose for the lot split was to divide the Property to allow their children to build/buy homes on their current property residence.  There was no intention or plan to develop the Property commercially now or anytime in the future and Defendant knew that from the start.

15.    From the outset, the Defendant refused to allow a simple lot split. When the Plaintiffs first purchased the Property in 2015, the lot split option remained available but, in the years following, the Defendant continued to restrict lot splits by adding/expanding public road frontage, prohibiting flag lots, and imposing other restrictions that affected the Plaintiffs' options. Although the ordinances applicable at the time in 2022 also allowed a minor subdivision of three lots or less by simple surveying and division, Stockman told the Plaintiffs that the Defendant would never approve their request. Instead, Stockman

4

instructed the Plaintiffs that they would have to seek approval of a major subdivision by using the platting process.

16.    In the end, Stockman told the Plaintiffs that they could not seek a lot split under the minor subdivision rules for a variety of reasons.  First, although the Property has thousands of road frontage on Engen Blvd. – a public gravel road – the Defendant claimed that there was not enough front footage that was dry (i.e. did not have to cross any potential wetlands) for the requested lot split. Second, although three lots could have been drafted with sufficient front footage to allow each lot to have its own separate driveway, the City Planner said the Defendant would not approve such a split because it would result in "flag lots." Defendant did not make clear which ordinance prohibited such "flag lots" since other similar flag lot designs had been previously approved by the Defendant.  Third, although the Plaintiffs offered many other alternatives – taking an easement off their current driveway (only three houses on that driveway by easement previously approved by the Defendant) or off a new driveway constructed on the Property, for example – Stockman told Plaintiffs said no easements would be approved. But again, it was not clear what ordinance prohibited such easements particularly since other similar easements regularly were approved by the Defendants.

17.    What became clear in the discussions is that the Defendant wanted a public road going east to west from Nowthen Blvd. (Anoka County Highway 5) to Tiger Street, which would be named 205th Avenue NW. This potential roadway apparently appears in various long range planning documents, and Stockman confirmed the Defendant's desire for such a roadway given the Defendant's lack of east to west roadways. In the early

discussions, the Defendant also wanted that roadway to have a T-junction that went north toward 211th Avenue NW. But the residents who appeared at the public hearing on the requested variance were opposed to the construction of any road (named 205th Avenue NW or otherwise) and several city officials suggested that 205th Avenue NW would never be constructed or accepted by the Defendants.

18.     Without a public road crossing on the Property, new 205th Avenue NW would not be possible. To the best of Plaintiffs' knowledge, the Defendant does not own or have easements to land on either the east or the west of the Property, making the realization of a future 205th Avenue NW not possible without considerable further expense.

19.     Ultimately, Stockman told the Plaintiffs that they could not use the minor subdivision ordinance (with or without a variance) to simply split the Property into three parcels. Instead, the Plaintiffs would be forced to use the major subdivision ordinance meant for public developers to build multiple houses for commercial development. This was done even though Defendants knew the Plaintiffs had no intention of developing their family Property commercially ever.

20.     The major subdivision ordinance imposes significant costs on developers and for good reason. The Plaintiffs understand that the major subdivision ordinance was copied from cities closer to Minneapolis and St. Paul that allowed lots as small as ¼ acre and promoted commercial development housing tracts consisting of hundreds of houses. Imposing road building and other expensive requirements on developers in those circumstances make sense because the costs imposed could be spread among numerous tiny lots. Not possible in Nowthen with its large lot minimums.

6

21.    The Plaintiffs did not want to develop the Property commercially nor could they have done so economically given the conditions that the Defendant sought to impose in addition to the lot size restrictions and wetland areas. Because the Defendant knew all that, forcing the Plaintiffs to use the major subdivision ordinance imposed unreasonable costs on their zoning requests.

22.    But the Defendant wanted that land for a public road (which it would have otherwise had to take and pay for under public condemnation proceedings), and they knew by applying the major subdivision ordinance to the Plaintiffs (and refusing to consider any other less onerous suggestions), they could force the Plaintiffs not only to give the Defendant the necessary land but also make them pay to construct a public two-lane blacktop road.

23.    The Plaintiffs' hands were now tied as they were told there was no alternative and with no disclosure from the Defendant of the significant costs that would be imposed in the future, the Plaintiffs proceeded to seek approval of the three-lot split *via* the major subdivision process.

24.    In good faith and based on the Defendant's representations, the Plaintiffs hired a survey company to create a proposed plat and engaged the Defendant in discussions about the requirements.  Although they were told and agreed to pay the fees associated with the Defendant's third-party consultants, the Plaintiffs had no idea that the Defendant would ultimately charge them tens of thousands of dollars in consultation fees.  For every question or call, there was another bill and many of these charges were incurred after the Defendant changed City Planners at the end of 2023 and, as such, had to bring the new

City Planner up to speed for months after the Defendant retroactively cancelled the approval process. The Plaintiffs also were unaware that they would have to pay more than $50,000 for wetland delineation (not necessary for lot split), multiple calculations regarding water runoff and storm water calculations (not necessary for lot split), road construction planning, surveying services and drafting services.

25.    When the Plaintiffs learned that the major subdivision ordinance also required them to construct a two-lane blacktop road, they first sought relief from the Defendant as building a blacktop road was inconsistent with the neighborhood (almost all the roads around the Property are gravel) and because none of their neighbors wanted blacktop.

26.    To that end, the Plaintiffs sought a variance from the Defendant to only build a gravel road thinking that building such a road would not be significantly more expensive than a quality driveway. That request would require the survey company to recalculate the storm water runoff needs of the Property. Nonetheless, the Plaintiffs made the request to defer blacktop, thinking that would be a considerable cost savings.

27.    Before the Defendant responded to that request, the Plaintiffs obtained preliminary estimates for the construction of 205th Avenue NW as a public road with only gravel and not blacktop. They were shocked to learn that the preliminary estimated costs for the gravel road were approximately $250,000 to $350,000, which would be an average in the neighborhood of $100,000 per lot. Faced with this estimate and with the other costs continuing to mount, the Plaintiffs decided to seek a variance from the Defendant for road

construction completely and seek permission for only a driveway with easements – an idea that they had raised before but were told that the Defendant would never approve.

28.   In August 2023, the Plaintiffs asked the Defendant to approve a plan that would not require a road to be built in either gravel or blacktop but instead, allow for a driveway with easements for the other lots.  They agreed, as part of their proposal, that they would still deed the land to the Defendant for the roadway and would agree to build the road in the future if any additional development occurred (i.e., further division of the Property).

29.   At the public hearing on the variance proposal, the Plaintiffs explained their family plans to the City Planning group, which is made up of the Mayor and City Council members.  Other City residents supported the Plaintiffs' proposal and spoke against any creation of 205th Avenue NW or any blacktop roads in their neighborhoods.

30.    The Plaintiffs found (contrary to what they were told in the beginning) that, in fact, the Defendant would approve such an approach.  Not only would the Defendant defer any obligation to build to road until the Property was split again in the future, but they would allow the Plaintiffs to build any twelve-foot driveway (no base material or depth requirements despite the Defendants' previously asking for them to be required) and allow easements for up to two houses as long as the driveway had a turnaround at the end. If a third house was built, the driveway would have to be increased to twenty-foot width.

31.   That promise by the City Planning group lowered the cost from $250,000 or $350,000 to approximately $25,000 to $35,000 or one-tenth of the road construction costs. The City Planning group also recognized that if the 205th Avenue NW Road project did not

9

go forward (as many city residents opposed it at the meeting), that the obligation for the Plaintiffs to build the road in the future would not be required. No mention was made of any other requirements at that meeting.

32.     The Plaintiffs left the 2023 meeting thinking that they had an agreement with the Defendant. Of course, formal approvals would be required by the City Council but the City Planning group was made up of those decision makers.  Although the Plaintiffs had already spent tens of thousands of dollars on the surveying and wetland delineations, that money was already spent.  At that time, they had no idea that the Defendant was accruing but not billing (billing during this time lagged over a year), tens of thousands of dollars of additional consulting fees.  But at least now the Plaintiffs did not have to commit hundreds of thousands of dollars to build a public road – gravel or blacktop – and their son and his family could proceed with their home construction.

33.     Because they thought that the issues had been resolved, the Plaintiffs agreed with their son and his family that they should go ahead and start construction on their house because the lot split would be finalized before the house was concluded.

34.     Thereafter, the City Council addressed the preliminary plat approval by the City Planning group. The Plaintiffs did not attend this meeting because they understood all the conditions from the City Planning group meeting made up the final agreement between the parties.

35.     But before and at the meeting, the Defendant's consultants started adding new requirements never raised with the Plaintiffs, including that the Plaintiffs must agree to a "developers agreement" before the final approval of the plat.  The Defendant, the

10

consultants, the Mayor, and the City Council members all knew that the Plaintiffs had no plans to commercially develop the Property, so a developers' agreement made no sense.

36. Nonetheless, months later – after the Plaintiffs' son's house was already under construction – the City Attorney provided a lengthy draft developer's agreement that had dozens of requirements never discussed by the Parties or disclosed by the Defendant. The draft agreement speaks for itself, but it was clear that the Defendants did not even consider the agreements made with the City Planning group and did not even consider the facts surrounding the Plaintiffs' request for a minor lot split.

37. Although it was clear that dozens of the provisions had nothing to do with the Property and ignored the agreement already reached with the City Planning group, the Plaintiffs took the draft agreement and spent hours eliminating the surplus pages and paragraphs unrelated to the Property or what they understood was the deal they had made with the Defendant. They sent that redlined draft back to the Defendant.

38. The Plaintiffs subsequently provided their redlined edits to the contract multiple times, provided a draft easement agreement (never requested before), and provided proof of a clear title to the Property. They continued to inform the Defendant that they were not developers and did not believe the inclusion of numerous standard clauses that were irrelevant should be included in the contract. For example, one of many added requirements was to require the Plaintiffs to install dozens and dozens of wetland warning signs around the Property to warn contractors that were never going to develop the Property.

39.     The former Nowthen mayor, Jeff Pilon, tried to assist the Plaintiffs to obtain final approval, but the Defendant would not relent.  Back and forth the agreement went but each time the Plaintiffs added back the paragraphs setting forth the agreement that had been reached with the City Planning Group, the City Attorney took them out and added new ones or restored form provisions meant to deal with developers.

40.     First, the turnaround planned for the end of Jason's driveway was deemed too close to the house to satisfy the Defendant.  Instead, the Defendant wanted a hammerhead turnaround at least a certain distance from the house. However, it was never made clear which ordinance had this requirement.

41.     Second, the Defendant wanted the culvert already installed near Engen Blvd. to be changed from reinforced composite to steel.  Although no real justification was given, the Plaintiffs changed the culvert.

42.     Then the Defendant wanted a pull-off on the driveway to allow firetrucks to wait off the driveway when other firetrucks passed by. Because Jason's home was nearing completion, the Plaintiffs agreed to make these additional changes so the Defendant would issue a certificate of occupancy, which was being held up because of these additional demands by the Defendant.

43.     At this point, the Defendant went quiet. The Plaintiffs sent several emails to the Defendant trying to get the process completed but were not getting any responses. Frustrated and seeking to move the process forward, the Plaintiffs raised the possibility of filing a lawsuit to determine the rights of the parties under federal and state law.

44.     Following the Plaintiffs' comments relating to a lawsuit, the Defendant sent them a letter of termination. The termination letter (sent many months later) was based on the Defendant's claim that the preliminary and final approvals "expired" in August 2025 because the Plaintiffs had not signed the version of the developer's agreement that the Defendant wanted.  This was the first time the Plaintiffs had heard of the August 2025 deadline.

45.     Even after the so-called automatic termination in August 2025, the Defendant continued to bill the Plaintiffs for legal work and meetings after August. These were not meetings with the Plaintiffs but instead were meetings between the Defendant's contractors and for legal work after the termination. Even after the termination letter, the Defendant continued to bill the Plaintiffs for work done on their plat project even though it had been cancelled. The total bill from the Defendant is now over $20,000.  Defendant even bill Plaintiffs for responding to the demand letter Plaintiffs sent before this lawsuit.

46.     To satisfy the Defendant's current demands, the Plaintiffs would have to start the process over, deed more than two acres of land over to the Defendant, pay more than $500,000 to build a road, build storm ponds, and again create multiple sets of plans.  The Plaintiffs simply want to split a parcel of land into three lots so their children could live in Nowthen and not some commercial development.

13

## **COUNT I**

### **Violation of Takings Clause, U.S. Const. amend. V**
### **(42 U.S.C. § 1983)**

47.     All previous paragraphs are incorporated herein by reference as though fully set forth.

48.     The Takings Clause of the Fifth Amendment of the United States Constitution provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend V.; *see also Chicago, Burlington & Quincy Ry. v. Chicago*, 166 U.S. 226, 234–35 (1897) (incorporating and making applicable to states the Takings Clause of the Fifth Amendment through the Due Process Clause of the Fourteenth Amendment).

49.     United States Code Section 1983 ("Section 1983") prohibits those acting under the color of law of any state from depriving "any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

50.     A government agency imposing a land-use permit condition that requires the dedication of private property "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994).

51.     The Defendant's stated purpose in this case is to build the future 205th Avenue NW, or more broadly, to build public roads. The ordinance at issue shifts that cost

to the "developer" because the developer is creating a new neighborhood that will require a public blacktop road due to higher use.  None of that applies to the Plaintiffs.

52.    Even if the Defendant's purpose was lawful and procedurally proper, the Defendant failed to make an individualized determination related both in nature and extent. The Defendant's refusal to allow a simple lot split unconstitutionally impacted the land rights of the Plaintiffs to use the Property, and the requirement that the Plaintiffs sign a developer agreement and the concomitant requirements were well out of proportion.

53.    The Defendant's requirements for (1) a two-lane blacktop road (built to specific expensive DOT standards), (2) a land deed for and the installation of drainage ponds and (3) other unnecessary conditions including those related to wetlands, indemnification, inspection access, are not reasonably related to the interests of the Defendant. This is not a commercial development proposed by the Plaintiffs.

54.    Because of the Defendant's unconstitutional requirements, the Defendant violated the Plaintiffs' constitutional rights.

55.    The Plaintiffs suffered injury and damages from the Defendant's actions.

56.    The Plaintiffs seek injunctive relief, monetary damages and punitive damages (on the federal claim), reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

## COUNT II

### Taking under the Minnesota Constitution (Art. 1, Sec. 13)

57.    All previous paragraphs are incorporated herein by reference as though fully set forth.

15

58.     The Takings Clause of the Minnesota Constitution states that private property must not be taken, destroyed, or damaged for public use without payment of just compensation. Minn. Const. Art. 1, §13; *see also McShane v. City of Faribault,* 292 N.W.2d 253 (Minn. 1980) (airport safety zoning ordinance that limited development and caused a substantial and measurable decline in market value was a taking).

59.     The language of the Takings Clause in the Minnesota Constitution is "broader" than the Fifth Amendment. *State by Humphrey v. Strom*, 493 N.W.2d 554, 558 (Minn. 1992).

60.     The Minnesota Supreme Court wrote in *DeCook* v. *Rochester Int'l Airport Joint Zoning Bd.,* 796 N.W.2d 299, 305 (Minn. 2011) that "government regulation of private property may result in a taking even though the government has not directly appropriated nor physically invaded the property."

61.     The character of the taking here results in a physical invasion of the Property and does not create a public good necessary to a legitimate government purpose.  The requirements imposed by the Defendant are disproportionate to the nature and extent of the impact of the proposed development.

62.     The Defendant's stated purpose in this case is to build the future 205th Avenue NW, or more broadly, to build public roads, and shift that cost to the "developer" because the developer is creating a new neighborhood that will require a public blacktop road because of the increased use.  None of that applies to the Plaintiffs.

63.     Assuming the Defendant's purpose was lawful and procedurally proper, the Defendant failed to make an individualized determination related both to the nature and

16

extent of the taking.  The Defendant's refusal to allow a simple lot split unconstitutionally impacted the land rights of the Plaintiffs to use the Property, the requirement that Plaintiffs sign a developer agreement and the concomitant requirements were well out of proportion.

64.     The Defendant's requirements for (1) deed over land for and then build a two-lane blacktop road (built to specific expensive DOT standards), (2) a deed or permanent easement for and to install drainage ponds and (3) other unnecessary conditions, including those related to wetlands, indemnification, inspection access, are not reasonably related to the interests of the Defendant. This is not a commercial development proposed by the Plaintiffs.

65.     Because of the Defendant's unconstitutional requirements, the Defendant violated the Plaintiffs' constitutional rights.

66.     The Plaintiffs suffered injury and damages from the Defendant's action.

67.     The Plaintiffs seek injunctive relief, monetary damages and reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

## COUNT III

### Retaliation under the U.S. Const. amend. I and XIV
### (42 U.S.C. § 1983)

68.     All previous paragraphs are incorporated herein by reference as though fully set forth.

69.     The Plaintiffs have a protected interest under the U.S Constitution to speech and access to the legal system including the right to pursue civil claims in the court system to protect their rights.

70.     The Defendant's decision to cancel all approvals and require the Plaintiffs to restart the costly and time-consuming permit process only came after the Plaintiffs suggested that they would file a civil action challenging the actions of the Defendant.

71.     The Defendant retaliated against the Plaintiffs by cancelling the preliminary and final approval of the plat because the Plaintiffs refused to agree to unnecessary and overly burdensome conditions and raised the possibility of filing a lawsuit to determine the rights of the parties under federal and state law.

72.     The Defendant took these acts to punish the Plaintiffs for the exercise of their constitutional rights under the First and Fourteenth Amendments.

73.     The Defendant's conduct was either motivated by evil intent or done with reckless or callous indifference to the rights of the Plaintiffs.

74.     The Plaintiffs have suffered injury and damages from the Defendant's actions.

75.     The Plaintiffs seek injunctive relief, monetary damages, punitive damages (for the federal claim), reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

## COUNT IV

### Retaliation under the Minnesota State Constitution

76.     All previous paragraphs are incorporated herein by reference as though fully set forth.

77.     Article 1 of the Minnesota Constitution protects the Plaintiffs' right to free speech, access to the courts and the right to redress from injury or wrongs and due process.

78.     The Defendant's decision to cancel all approvals and require the Plaintiffs to restart the costly and time-consuming permit process only came after the Plaintiffs suggested that they would file a civil action challenging the actions of the Defendant.

79.     The Defendant retaliated against the Plaintiffs by cancelling the preliminary and final approval of the plat because the Plaintiffs refused to agree to unnecessary and overly burdensome conditions and raised the possibility of filing a lawsuit to determine the rights of the parties under federal and state law.

80.     The Defendant took these acts to punish the Plaintiffs for the exercise of their constitutional rights under the Minnesota Constitution.

81.     The Defendant's conduct was either motivated by evil intent or done with reckless or callous indifference to the rights of the Plaintiffs.

82.     The Plaintiffs have suffered injury and damages from the Defendant's actions.

83.     The Plaintiffs seek injunctive relief, monetary damages, reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

## COUNT V

### Violation of Procedural Due Process
### (42 U.S.C. § 1983)

84.     All previous paragraphs are incorporated herein by reference as though fully set forth.

85.     Section 1983 prohibits those acting under the color of law of any state from depriving "any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

86.     The Defendant was, at all relevant times herein, acting under the color of state law.

87.     In violation of the Fourteenth Amendment and 42 U.S.C. § 1983, the Defendant deprived the Plaintiffs of their rights in the Property and permits without due process.

88.     The Plaintiffs have protected Property interests to use the private Property without unreasonable restrictions.  Those rights cannot be taken away by the Defendant without due process.

89.     The Defendant provided the Plaintiffs with no notice or pre-deprivation hearing before an impartial tribunal, or any other Constitutionally adequate hearing or procedure to address or remedy the deprivation when it decided to unilaterally terminate the approval of the simple lot split.  This resulted in an erroneous deprivation of the Plaintiffs' rights and interest in the Property.

90.     The Defendant's conduct was either motivated by evil intent or done with reckless or callous indifference to the federally protected rights of the Plaintiffs because it was done in retaliation of the Plaintiffs' exercising their legal rights.

91.     The Plaintiffs have suffered injury and damages because of the Defendant's actions.

92.     The Plaintiffs seek injunctive relief, monetary damages and punitive damages (for federal claim), reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

## COUNT VI

### Violation of Procedural Due Process under Minnesota Constitution
### (Art. 1, Section 7)

93.     All previous paragraphs are incorporated herein by reference as though fully set forth.

94.     Article I, Section 7 of the Minnesota Constitution provides the Plaintiffs the right to procedural due process.

95.     The Defendant was, at all relevant times herein, acting under the color of state law.

96.     In violation of the Minnesota Constitution, the Defendant deprived the Plaintiffs of their rights in the Property and permits without procedural due process.

97.     The Plaintiffs have protected property interests to use their private Property without unreasonable restrictions.  Those rights cannot be taken away by the Defendant without due process.

21

98.     The Defendant provided the Plaintiffs with no notice or pre-deprivation hearing before an impartial tribunal, or any other adequate hearing or procedure to address or remedy the deprivation when it decided to unilaterally terminate the approval of the simple lot split.  This resulted in an erroneous deprivation of the Plaintiffs' rights and interest in the Property.

99.     The Defendant's conduct was either motivated by evil intent or done with reckless or callous indifference to the federally protected rights of the Plaintiffs because it was done simply due to retaliation of the Plaintiffs' exercising their legal rights.

100.    The Plaintiffs have suffered injury and damages because of the Defendant's actions.

101.    The Plaintiffs seek judgment, injunctive relief, monetary damages and reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

## COUNT VII

### Breach of Contract

102.    All previous paragraphs are incorporated herein by reference as though fully set forth.

103.    The Defendant breached the contract when it unilaterally cancelled the preliminary and final plat approvals.

104.    The Defendant, including through the City Planning group and the City Council and other agents and employees of the Defendant, entered into an agreement with the Plaintiffs that they could split their lot with no requirement for a gravel or blacktop

road but instead, only a requirement to construct a driveway with easements for the other lots.

105. The representations, promises, and conduct of the Defendant were sufficiently specific and formal so that the Plaintiffs had a reasonable expectation that no additional requirements would be added or a later revocation of this agreement would occur.

106. The Plaintiffs were performing their obligations under the contract up until the breach by the Defendant.

107. Therefore, the Plaintiffs reasonably and in good faith relied on this contract that the Defendant improperly and unilaterally breached by terminating the permit process.

108. This breach will require the Plaintiffs to spend tens of thousands of dollars more trying to get approval that should have taken weeks not years and should have cost a few thousand, not almost $100,000 with required commitments of over ½ a million dollars in the future.

109. The Plaintiffs have suffered injury and damages because of the Defendant's actions.

110. The Plaintiffs seek injunctive relief, monetary damages and reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

## COUNT VIII

### Promissory Estoppel Claim

111.   All previous paragraphs are incorporated herein by reference as though fully set forth.

112.   The Plaintiffs plead this promissory estoppel claim in the alternative to their breach of contract claims.

113.   "To assert a promissory-estoppel claim, a valid contract is not required. Promissory estoppel 'allows courts to enforce a promise on equitable grounds' in situations when 'parties did not enter into a contract.'" *Satanic Temple v. City of Belle Plaine, Minnesota*, 475 F. Supp. 3d 950, 966 (D. Minn. 2020), aff'd, 80 F.4th 864 (8th Cir. 2023).

114.   As detailed above, the Defendant unambiguously promised the Plaintiffs would not be required to build a gravel or blacktop road but instead, construct a driveway with easements for the other lots.  This promise included that the Defendant would not only defer any obligation to build a road until the Property was split again in the future, but they would instead allow the Plaintiffs to build any 12-foot-wide driveway and allow easements for up to two houses.  If a third house was built, the driveway would have to be increased to a 20-foot width. The only other requirement was a turnaround at the end of the driveway of a certain radius.

115.   The Plaintiffs reasonably relied on the Defendant's promises and started the construction of a home for their son and his wife.

116.   It was expected and foreseeable by the Defendant that the Plaintiffs would reasonably rely on its unambiguous promises.

24

117.   The Defendant breached its promises to the Plaintiffs.

118.   The Plaintiffs have suffered injury and damages because of the Defendant's actions.

119.   The Plaintiffs seek injunctive relief, monetary damages and reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

## COUNT IX

### Breach Of Implied Contract

120.   All previous paragraphs are incorporated herein by reference as though fully set forth.

121.   The Plaintiffs plead this breach of implied contract in the alternative to their breach of contract and promissory estoppel claims.

122.   As detailed above, the Defendant unambiguously promised the Plaintiffs would not be required to build a gravel or blacktop road but instead, construct a driveway with easements for the other lots.  This promise included that the Defendant would not only defer any obligation to build a road until the Property was split again in the future, but they would instead allow the Plaintiffs to build any 12-foot-wide driveway and allow easements for up to two houses.  If a third house was built, the driveway would have to be increased to a 20-foot width. The only other requirement was a turnaround at the end of the driveway of a certain radius.

123.   These promises by the Defendant created an implied contract upon which the Plaintiffs reasonably relied to their detriment.

124.    The Defendant breached its implied contract with the Plaintiffs.

125.    The Plaintiffs have suffered injury and damages because of the Defendant's actions.

126.    Plaintiffs seek injunctive relief, monetary damages and reasonable attorney fees and costs, and any other legal or equitable relief under the law as is necessary or just.

**REQUEST FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that the Court:

A.      Enter judgment in the Plaintiffs' favor on their claims against the Defendant in an amount to be determined at trial, including attorneys' fees, costs, reimbursement, and interest, both pre- and post-judgment, the exact amount to be proven at trial;

B.      Declare that the Defendant's conduct, as set forth above, violates the U.S. Constitution, the Minnesota Constitution, Minnesota state law, and 42 U.S.C. § 1983;

C.      Award the Plaintiffs damages to compensate them for the harm they suffered as a result of the Defendant's unlawful conduct;

D.      Award the Plaintiff's punitive damages on their federal law claims for Defendants' willful, intentional and reckless conduct;

E.      Grant the Plaintiffs leave to amend this Complaint to include a claim for punitive damages (after filing of a proper motion) with respect to their state law claims, the exact amount to be proven at trial;

F.      Award the Plaintiffs' injunctive relief that approves a simple lot split with easements as approved by the City Planning group without any further conditions;

G.      Award the Plaintiffs' reasonable expenses incurred in this litigation,

including attorney and expert fees, pursuant to 42 U.S.C. § 1988 and Minnesota state law;

H.      An award of all costs and attorneys' fees pursuant to any applicable statute

authority; and

I.      Any other relief that this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury of all claims so triable.


                                        Respectfully admitted,

Dated: December 23, 2025                */s/ Daniel E. Gustafson*
                                        Daniel E. Gustafson (#202241)
                                        **GUSTAFSON GLUEK PLLC**
                                        Canadian Pacific Plaza
                                        120 South 6th Street, Suite 2600
                                        Minneapolis, MN 55402
                                        Tel: (612) 333-8844
                                        dgustafson@gustafsongluek.com